IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| BUDDY LEE LASH, | ) CASE NO. 10-51171 |
| | ) |
| | ) |
| Debtor. | ) Chapter 13 |
| | ) |

## MEMORANDUM OPINION

This matter came before the Court on October 20, 2010, for a hearing on: (1) the Objection to Claim by Tucker Capital, Inc., filed by the above-referenced debtor (the "Debtor") on August 13, 2010; (2) confirmation of the Debtor's Chapter 13 plan of reorganization, filed by Kathryn L. Bringle, the Chapter 13 Trustee (the "Trustee"), on August 31, 2010; (3) the Objection to Confirmation of Chapter 13 Plan filed by Tucker Capital, Inc. ("Tucker Capital") on September 28, 2010; and (4) the Motion for Relief from the Automatic Stay, filed by Tucker Capital on September 28, 2010.  Wendell W. Schollander, III appeared on behalf of the Debtor, Ashley A. Edwards appeared on behalf of Tucker Capital, and Vernon C. Cahoon appeared on behalf of the Trustee. At the hearing, the Court took all matters under advisement in order to determine, as a preliminary matter, whether the agreement between the Debtor and Tucker Capital created a true lease or a security interest.

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984.  This is a core proceeding

1

within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B), (G), (K), and (L), which this Court has the jurisdiction to hear and determine.

## II.  FACTS

On or about May 24, 2007, the Debtor, as Lessee, and Tucker Capital, as Lessor, entered into an agreement titled Equipment Lease (the "Agreement") for the use of a 2003 Freightliner.  The Agreement provided that the Debtor would make an advance payment of $4,874.37, followed by one payment of $500.00, and forty-one monthly payments of $1,570.00.  The summary at the beginning of the Agreement lists the "Total Cost" as $42,250.00.  It shows a "TRAC Percentage" of 10% and a "TRAC Amount" of $4,225.00.

The Agreement provides that it shall be governed by Utah law.  Paragraph 3(b), entitled "Automatic Extension Terms," provides:

> Lessee or Lessor may terminate the Lease at the expiration of the Initial Term by giving the other at least 90 days prior written notice of termination. If neither Lessee nor Lessor gives such notice, then the term of this Lease shall be extended automatically on the same rental and other terms set forth herein . . . for successive periods of one month (each, an "Extension Term") until terminated by either Lessee or Lessor after giving the other party at least 90 days prior written notice of termination.

Paragraph 13 of the Agreement, entitled "Loss or Damage," provides that if the equipment is "lost, stolen, destroyed, damaged beyond repair, or rendered permanently unfit for use for any reason," then the Debtor will pay Tucker Capital all remaining rent for the Initial Term, as well as the TRAC Amount.  Tucker Capital would then transfer all of its rights and interests in the equipment to the Debtor.  Paragraph 13 further provides that "[a]ny insurance or condemnation proceeds received shall be credited to Lessee's obligation under [Paragraph 13] and Lessor shall be entitled to any surplus."  Pursuant to Paragraph 14, the Debtor is required to obtain insurance on

the Freightliner.

> Paragraph 15, entitled "Return of Equipment," provides:
>
>> Upon the expiration or earlier termination of this Lease, Lessee will immediately deliver the Equipment to Lessor in the same condition as when delivered to Lessee, ordinary wear and tear excepted, at such location within the continental United States as Lessor shall designate. Lessee shall pay all transportation and other expenses relating to such delivery.
>
> Paragraph 20, entitled "Terminal Rental Adjustment Clause (TRAC)," provides:
>
>> Lessor and Lessee hereby agree that at the expiration of the Initial Term of the Lease according to its original terms (and not early on account of default or otherwise) the Equipment will be sold by the Lessor (or by an agent of Lessor). The proceeds of the sale (the "Proceeds") shall be distributed as follows: [a)] First, to reimburse Lessor or its agent for the cost of putting the Equipment in a condition to be sold, sales commissions, legal fees, expenses of repossession and all other expenses of sale, b) Second, the balance to Lessor up to an amount equal to the percentage of the original cost of the Equipment set forth as the TRAC Percentage on the first page of this Lease, c) Third, the balance, if any, to Lessee as an adjustment to rent previously paid by Lessee to Lessor pursuant to this Lease.
>>
>> In the event the Proceeds are less than the sum of subsection (a) plus subsection (b) immediately above, the Lessee shall pay to the Lessor the deficiency as additional rent pursuant to this Lease but in any event not more than the percentage of the original cost of the Equipment set forth as the TRAC Percentage on the first page of this Lease . . . .

On June 24, 2010, the Debtor filed his Chapter 13 bankruptcy petition. The Debtor's schedules are somewhat inconsistent. The Freightliner was not listed in Schedule B, and Tucker Capital was listed in Schedule G. But Tucker Capital was also listed as a secured creditor in Schedule D, where the Debtor assigned a $20,000.00 value to the Freightliner.

On July 12, 2010, Tucker Capital filed a proof of claim, indicating "Breach of Lease Agrmt" as the basis for its claim. It listed a secured claim of $29,996.00. Attached to the proof of claim was

3

a letter indicating that the "buyout amount" on the contract was $29,996.00, and that "[i]n order to acquire the equipment," the Debtor had to pay that amount by August 7, 2010. Also attached was a copy of the Agreement, and a certificate of title indicating that Tucker Capital was the owner of the Freightliner.

On August 13, 2010, the Debtor filed an objection to Tucker Capital's claim. The objection stated that the Debtor received a pay history on June 11, 2010, which indicated a receivable balance of $18,524.47, and contained a handwritten note that stated: "Residual Pmt - $4,225.00." Therefore, the Debtor argued, the amount owed to Tucker Capital was in fact only $22,759.47.

On August 31, 2010, the Debtor's proposed Chapter 13 plan (the "Plan") was filed. Tucker Capital was included in Section IV.4, entitled "Real Property and Personal Property Partially Secured Claims," which provided in part that "[a]ny timely filed proof of claim documenting evidence of a non-preferential perfected lien against the property indicated below will be paid by the Trustee as secured up to the value of the property as indicated with any balance being an unsecured general claim." Tucker Capital's claim was assigned a secured value of $18,500.00. The plan proposed payments to Tucker Capital of $355.00 per month, at 5.25% interest. However, next to the description of the treatment of Tucker Capital's claim was a parenthetical notation stating: "See Section VII. #2." Section VII, entitled "Executory Contracts/Leases," indicated that the Trustee would make disbursements to Tucker Capital and that the "Debtor assumes the lease and proposes to exercise the purchase option of the contract," referencing Section IV.4 of the Plan.

On September 28, 2010, Tucker Capital filed an objection to its treatment under the Plan, arguing that since the Agreement is an executory contract, the Debtor was required to cure his pre-petition default and make monthly payments of $1,570.00 as required by the lease. Concurrently

4

with its objection, Tucker Capital filed a motion for relief from the automatic stay.

Tucker Capital argues that the Agreement is a true lease because the bright-line test of U.C.C. § 1-203(b) is not satisfied, and it retains a meaningful reversionary interest at the end of the Initial Term. Tucker Capital argues that the Debtor has "options" under the Agreement, which alternatively allow (1) the Debtor to renew the lease, (2) the Debtor to purchase the Freightliner for the TRAC Amount, or (3) Tucker Capital to sell the Freightliner and retain the proceeds. The Debtor argues that the Agreement actually created a security interest under U.C.C. § 1-203(b) since the TRAC Amount was nominal in comparison to the value of the Freightliner and the total payments made by the Debtor.

### III. DISCUSSION

State law governs property rights, including the existence, validity and extent of a security interest. Butner v. U.S., 440 U.S. 48, 54-55 (1979). Thus, state law determines whether an agreement creates a true lease or a security interest.[1] Powers v. Royce, Inc. (In re Powers), 983 F.2d 88, 90 (7th Cir. 1993). Since the Agreement contains a Utah choice of law provision, Utah law governs.

U.C.C. § 1-203, adopted by Utah Code Ann. § 70A-1a-203, addresses whether a transaction creates a true lease or a disguised security interest.[2] A review of relevant Utah cases reveals that Utah courts apply U.C.C. § 1-203 consistently with the majority of courts that have applied identical

---

[1]Section 101(50) of the Bankruptcy Code defines "security agreement" as an "agreement that creates or provides for a security interest." 11 U.S.C. § 101(50). A "security interest" is a "lien created by an agreement." 11 U.S.C. § 101(51).

[2]For ease of reference, all citations hereinafter will be to the Uniform Commercial Code rather than to the Utah Code.

versions of the statute throughout the United States. See, e.g., Bd. of Equalization of Salt Lake County v. First Sec. Leasing Co., 881 P.2d 877, 879 (Utah 1994) (applying Utah Code Ann. § 70A-1-201(37)); Larson v. Overland Thrift and Loan, 818 P.2d 1316, 1321 (Utah Ct. App. 1992) (same).

It is appropriate to examine the opinions of other courts that apply U.C.C. § 1-203 to determine how to apply the law in this case. It is a well-accepted practice for courts faced with the true lease versus security interest issue to look to relevant decisions from other jurisdictions, since the Uniform Commercial Code has been adopted in all 50 states, and its purpose is to achieve uniformity. Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1175 n.7 (10th Cir. 2008) ("In the UCC context, decisions from other jurisdictions are particularly persuasive due to the uniform nature of the UCC"); Duke Energy Royal, LLC v. Pillowtex Corporation (In re Pillowtex, Inc.), 349 F.3d 711, 718 n.8 (3d Cir. 2003) ("Because N.Y. U.C.C. § 1-201(37) is based on the Uniform Commercial Code, decisions from other jurisdictions interpreting this same uniform statute are instructive."); In re Grubbs Constr. Co., 319 B.R. 698, 712 (Bankr. M.D. Fla. 2005) ("[C]ourts dealing with the lease versus security agreement issue generally look at cases from various jurisdictions"); In re QDS Components, Inc., 292 B.R. 313, 321 n.3 (Bankr. S.D. Ohio 2002) ("Because the UCC is a uniform law, decisions from other state and federal courts interpreting § 1-201(37) also may be considered."). Indeed, Utah courts applying the Uniform Commercial Code have looked to other jurisdictions for guidance. See, e.g., Creer v. Valley Bank and Trust Co., 770 P.2d 113, 115 (Utah 1988) (looking to the application of U.C.C. § 9-302 by courts from other jurisdictions); Herm Hughes & Sons, Inc. v. Quintek, 834 P.2d 582, 584 (Utah Ct. App. 1992) (looking to the application of U.C.C. § 2-204 by courts from other jurisdictions).

A. The Bright-Line Test

Under U.C.C. § 1-203, whether an agreement creates a true lease or a security interest is governed by a two-part test. The first step is frequently referred to as the bright-line test. To satisfy the bright-line test, which is codified in U.C.C. § 1-203(b), the court must determine that the "lease" is not subject to termination by the lessee and that at least one of four enumerated conditions is satisfied. In re Phoenix Equipment Co., No. 08-13108, slip op. at 7 (Bankr. D. Ariz. 2009) (2009 WL 3188684); see also U.C.C. § 1-203, cmt. 2 (2004) ("[s]ubsection (b) further provides that a transaction creates a security interest if the lessee has an obligation to continue paying consideration for the term of the lease, if the obligation is not terminable by the lessee . . . and if one of four additional tests is met"). U.C.C. § 1-203(b) states:

> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
> (1) The original term of the lease is equal to or greater than the remaining economic life of the goods;
> (2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
> (3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
> (4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

U.C.C. § 1-203(b); Utah Code Ann. § 70A-1a-203(2).[3]  "[A]ll of these tests focus on economics,

---

[3] U.C.C. § 1-203 is a re-codification of what was previously found in U.C.C. § 1-201(37). The official comments to Section 1-203 state that the "section is substantively identical to those portions of former Section 1-201(37) that distinguished 'true' leases from security interests, except that the definition of 'present value' formerly embedded in Section 1-201(37) has been placed in Section 1-201(28)." U.C.C. § 1-203, introductory cmt. (2004); see also In re Ecco Drilling Co., 390 B.R. 221, 226 n.29 (Bankr. E.D. Tex. 2008) (noting that the provisions of

7

not the intent of the parties." U.C.C. § 1-203, cmt. 2 (2004).

"If the lease is not terminable by the lessee and one or more of the enumerated conditions is present, then the contract is a per se security agreement, and the court's analysis may conclude." Phoenix Equipment, slip op. at 7; see also Pillowtex, 349 F.3d at 717 (finding that the former U.C.C. § 1-201(37) set out a bright-line test); In re Ecco Drilling Co., 390 B.R. 221, 227 (Bankr. E.D. Tex. 2008) (same); In re Brankle Brokerage & Leasing, Inc., 394 B.R. 906, 911 (Bankr. N.D. Ind. 2008) (finding that N.C. Gen. Stat. § 25-1-203(b) "lays out a bright-line test or per se rule which, if satisfied, mandates the conclusion that the agreement constitutes a security interest, rather than a lease, as a matter of law"). Thus, when a lease is not terminable by the lessee and there is a nominal purchase option, a security interest will exist, and no further inquiry is necessary. See, e.g., In re Wing Foods, Inc., No. 09-8062, slip op. at 4 (Bankr. D. Idaho 2010) (2010 WL 148637) ("The Agreement . . . may not be terminated earlier [than the full lease term] by Debtor [and] also gives Debtor the right to buy the goods at the conclusion of its term by payment of the nominal amount of one dollar. [Idaho's version of U.C.C. § 1-203] and pertinent case law require nothing more to deem this transaction a sale rather than a lease.").

In this case, the Debtor, as Lessee, is not permitted to terminate the Agreement until the expiration of the Initial Term, so the first part of the bright-line test has been satisfied. However, the second part of the test has not been satisfied. No evidence was presented regarding the value of the Freightliner. The Plan assigned the claim a secured value of $18,500.00, and Schedule D assigned the Freightliner a secured value of $20,000.00. However, neither of these sources is,

---

U.C.C. § 1-201(37) had been re-codified and that there was "no significant difference in the statutory approaches," and referring to the changes as "stylistic revisions").

without a proper foundation, admissible as evidence of value.  Fed. R. Evid. 201; see also  In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) (noting that while a bankruptcy court may take judicial notice of the content of bankruptcy schedules,  facts contained within such pleadings must comply with the Federal Rules of Evidence).  At the hearing, although the Debtor and Tucker Capital argued about whether the TRAC Amount is a nominal payment, neither party presented any evidence regarding the value of the Freightliner.  Thus, it is impossible for the Court to determine whether the TRAC Amount is a nominal payment since there is no evidence regarding either the present value of the collateral, or even what the parties initially projected the value of the collateral to be at the end of the lease term.  Therefore, the Court must move past the bright-line test and consider the economic realities of the transaction.

B.  The Economic Realities Test

If the bright-line test of U.C.C. § 1-203(b) is not satisfied, "then a security interest will not be conclusively found to exist, and the court will need to consider other factors."  Phoenix Equipment, slip op. at 7; see also QDS Components, 292 B.R. at 333 ("After determining that the Bright-Line Test has not been satisfied, an examination of all the facts and circumstances of the case must be made to determine whether the agreement in question is a true lease or disguised security agreement."). Under this second analysis, a court must examine the economic realities of the transaction to determine whether a security interest exists.  Pillowtex, 349 F.3d at 717; Grubbs, 319 B.R. at 714.  As one court colorfully put it:

> Failure to meet one of these conditions means only that the document is not conclusively a security agreement; the pinball has safely rolled past four holes each marked security agreement.  Evasion of these four holes does not earn one enough points to become a lessee.  Finding economic life beyond the lease term and seeing no nominal consideration option, what should a court do?  The court must then answer whether the lessor retained a reversionary interest.  If there is a meaningful

9

reversionary interest-either an up-side right or a down-side risk-the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security interest, not a lease.

Sankey v. ABCO Leasing (In re Sankey), 307 B.R. 674, 680 (D. Alaska 2004).

A determination that a lessor has retained a meaningful reversionary interest typically derives from the following facts: "(1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term." 319 B.R. at 715. When a purchase option is involved, if the lessee's only economically sensible option is to exercise the option, then the agreement will be considered to create a security interest. Id. at 716 (finding that the "Economic Realities Test" mandates "an analysis of all terms and conditions of a purported lease transaction to determine whether the lessee has no sensible alternative other than to exercise the purchase option"); In re Phoenix Pipe & Tube, L.P., 154 B.R. 197, 200 (Bankr. E.D. Pa. 1993) (concluding that an agreement created a security interest when "sensible economics" dictated that the debtor exercise a purchase option). This test has alternatively been referred to as the "No Lessee in its Right Mind Test." QDS Components, 292 B.R. at 329 n.7 (citing Morris v. Dealers Leasing, Inc. (In re Beckham), 275 B.R. 598, 603 (D. Kan. 2002)).

In Grubbs, the court analyzed the economic realities of a purported lease containing a Terminal Rental Adjustment Clause ("TRAC") provision. The agreement provided that at the end of the lease term, the debtor/lessee was obligated to pay the lessor a balloon payment equal to 20 percent of the amount borrowed. The TRAC provision provided that the equipment would be sold by the lessor to the highest bidder, with the net proceeds going toward to required balloon payment. The debtor was permitted to bid on the equipment. The debtor was required to pay any deficiency,

10

and the lessor was obligated to pay the debtor any surplus proceeds exceeding the amount of the balloon payment. 319 B.R. at 707. The court found that the economic realities of this situation were that of a secured transaction:

> The economic substance of the TRAC Lease is no different from a typical installment loan in which the lender has agreed to a balloon payment in lieu of a down payment. Whether characterized as a lease, which uses terms such as "Estimated Residual Value" as a substitute for "balloon" and "rental payments" instead of "installment payments," or characterized as an installment loan, the economic characteristics are identical and can be generically described as follows: The borrower finances the acquisition of equipment through a loan from a finance company. The loan is repaid over a set term, at the end of which the borrower must make the balloon payment. The "collateral" for the financing is sold at the end of the loan term, and the proceeds are applied toward the borrower's balloon payment. If there is a deficiency, the borrower is responsible for paying it. If there is a surplus, the borrower retains it. The lender has no expectation or right to retain ownership of the "collateral" at the conclusion of the loan period.

Id. at 707-08. Considering all the facts in the case, the Grubbs court concluded that the TRAC lease was "structured in all respects as a financing transaction wherein Grubbs would be responsible for the principal financed together with a predetermined interest rate and would receive credit for any surplus and be responsible for any deficiency in the collateral" and therefore it was a security agreement, not a true lease. Id. at 724.

An examination of the Agreement, which was admitted into evidence, reveals that Tucker Capital has retained no meaningful reversionary interest in the collateral. The TRAC provision provides that the equipment "will be sold" at the expiration of the Initial Term of the Agreement. Thus, the Debtor is required to comply with this provision, and does not have any alternative, as Tucker Capital contends. After the sale, the Debtor is liable for any deficiency and entitled to any surplus. Therefore, Tucker Capital bears no risk of loss, and cannot receive any benefit if the

Freightliner appreciates in value. Regardless of whether the Freightliner is worth $1,000,000.00 or $1.00 at the end of the lease term, Tucker Capital is entitled to receive the TRAC Amount of $4,225.00 – no more and no less. By comparison, the Debtor bears all the risk if the Freightliner depreciates and reaps all the reward if it appreciates. If the value is $1.00, the Debtor must pay Tucker Capital $4,225.00, plus any costs of sale. If the value is $1,000,000.00, the Debtor is entitled to receive that amount, less the TRAC Amount and any costs of sale. The TRAC clause, as was the case with the nearly identical provision in the Grubbs case, removes any meaningful reversionary interest from Tucker Capital and places it with the Debtor. Therefore, even with no evidence regarding the value of the Freightliner, it is clear that under the facts of this case, the Agreement created a security interest, not a lease.

## IV. CONCLUSION

For the reasons outlined above, this Court concludes that the Agreement is a security agreement, not a true lease. As discussed at the hearing, all four matters before the Court will be set for further hearing in order to consider the evidence and arguments of the parties in light of this opinion.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| BUDDY LEE LASH, ) | CASE NO. 10-51171 |
| ) | |
| ) | |
| Debtor. ) | Chapter 13 |
| ) | |

**PARTIES IN INTEREST**

Wendell Wes Schollander, III, Esq.

Brian D. Darer, Esq.

Ashley A. Edwards, Esq.

Vernon C. Cahoon, Esq.

Kathryn L. Bringle, Trustee

Michael D. West, Bankruptcy Administrator